THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| P.D. by and through her next friends, | § | |
| CHRISTOPHER DOHSE and KIMBERLY | § | |
| PITTARD, | § | |
|    Plaintiffs; | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  4:25-cv-3448 |
| | § | |
| FORT BEND INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
|    Defendant. | § | |
| | § | |

**PLAINTIFFS ORIGINAL COMPLAINT**

NOW COMES P.D. ("the Student") by and through her next friends and natural parents Christopher Dhose and Kimberly Pittard (collectively "Plaintiffs" herein) and files this their *Original Complaint* alleging that the School Board of Fort Bend Independent School District (or "the School District") violated the various rights of the Student. Further, that the acts and omissions of the School District Staff violated the procedural and substantive constitutional rights of the parents. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law and i support, thereof Plaintiffs would respectfully show this tribunal the following:

### I. BRIEF INTRODUCTION TO THE CASE

1.     It is uncontroverted that P.D. is a child with multiple disabling conditions and related overt behaviors. Over a significant portion of the Fall 2023 semester she was bullied and harassed by other students. Her parents complained over and over again to School District personnel with the authority to address their concerns but no one ever did. Left unrequited the harassment worsened and P.D. attempted to protect herself. Not surprisingly that did not go

      well and her behaviors worsened. Soon she was unnecessarily and excessively physically restrained by Staff on almost a daily and often multiple times a day. This included but was not limited to having a pillow placed over her face, forced to lie on her stomach with her hands behind her back, forced to sit in a square on the floor and punished if she moved and placed inside a locked Police Car by herself. She is now severely, and her parents hope, not irreversibly traumatized.

2. Due to a litany of acts and omissions by the School District all as more described below, P.D. by and through her natural parents file this *Original Complaint* claiming her civil rights pursuant to the 4th Amendment to the United States Constitution, to be free from unnecessary and excessive restraints, were violated by the School District as were her right to *Due Process* and *Equal Protection* pursuant to 14th Amendment. Moreover, that P.D. was a victim of discrimination based upon disability as contemplated by both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504") and the Americans With Disabilities Act, 42 U.S.C. §12131, et seq. ("ADA"). Separately P.D.'s parents, Chris Dohse and Kimberly Pittard have their own claims against the School District Defendant for violations of both their procedural and substantive rights under the 14th Amendment to the United States Constitution that likewise protected by 42 U.S.C. §1983

## II. JURISDICTION

3. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the constitution and laws of the United States.

4. This Court also has jurisdiction over this case as Plaintiffs have satisfied the Administrative Exhaustion requirements of the Individuals with Disabilities Education Act, 20 U.S.C.,

Section 1415(l) ("IDEA") and prevailed in that proceeding. *See* Cause Number 4:25-cv-01772.

### III. VENUE

5. Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Houston Division.

### IV. PARTIES

6. P.D. lives with her parents Christopher Dhose and Kimberly Pittard in Richmond, Texas 77406. At all times pertinent to this case, P.D. resided in FBISD catchment area.

7. Christopher Dhose and Kimberly Pittard reside within Richmond, Texas 77406.

8. The FBISD is a school district organized under the laws of the State of Texas. The School District may be served through their Superintendent, Dr. Marc Smith, at 16431 Lexington Blvd. Sugar Land, TX 77479.

### V. FACTUAL RESUME

A. SCHOOL BOARD POLICIES & PROCEDURES AND PARENTS' RIGHTS

    1. About The Fort Bend Independent School District

9. The School Board has developed policies and procedures regarding discrimination based upon disability. They are based upon and taken from commentary found in the Federal Register when the rules and regulations related to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 were promulgated; *see also* 34 C.F.R. §104.36. Moreover the United States Department of Education ("DOE") promulgated a number of professional directives on bullying and harassment of students with disabilities, and related to providing

accommodations to students with disabilities, from their own *Offices of Civil Rights* ("OCR"). Many have found their way into the Texas Education Code, Title 2 (Public Education), Subtitle G (Safe Schools); Chapter 37 (Discipline); Subchapter A (Alternative Settings For Behavior Management) and Subtitle E (Students and Parents); Chapter 26 (Parental Rights & Responsibilities). They are also enunciated in the Texas Family Code, Title 5 (the Parent-Child Relationship); Subtitle B (Suits Affecting The Parent-Child Relationship); Chapter 151 (Rights And Duties In Parent Child Relationship).

10. Taken together these federal law and state law, rules professional directives and now found in the Fort Bend Independent School Board Policies & Procedures noted below, act together as "Parent & Student Rights" with both significant substantive and procedural protections. For example, EHBA (LEGAL) - Special Programs: Special Education specifies that students with disabilities will not be discriminated against based upon their disability. Further, the school shall provide all students with a Free Appropriate Public Education ("FAPE"). In addition, FB (LOCAL) - Equal Educational Opportunity, specifies that a report of discrimination or harassment based on a student's disability shall be made in accordance with FFH (see below). Also, the District designated and authorized the ADA/Section 504 Coordinator for students to coordinate its efforts to comply with Title II of the Americans with Disabilities Act of 1990, as amended, which incorporates and expands upon the requirements of Section 504 of the Rehabilitation Act of 1973. Additionally, if the District has reason to believe that a student has a disability that may require additional services and supports in order for the student to receive an appropriate education as this term is defined by law, Section 504 and/or the Individuals with Disabilities Education Act (IDEA) shall

govern the evaluation, services, and supports provided by the District.

11. Finally, FFH (LOCAL) Student Welfare: Freedom from Discrimination, Harassment, and Retaliation states that reports of harassment based on disability may be directed to the designated ADA/Section 504 coordinator for students.

> "The District official or designee shall promptly notify the parents of any student alleged to have experienced prohibited conduct by a District employee or another adult. The District may request, but shall not require, a written report. If a report is made orally, the District official shall reduce the report to written form. Upon receipt or notice of a report, the District official shall determine whether the allegations, if proved, would constitute prohibited conduct as defined by this policy.
>
> If so, the District shall immediately undertake an investigation, except as provided below at Criminal Investigation. If the District official determines that the allegations, if proved, would not constitute prohibited conduct as defined by this policy, the District official shall refer the complaint for consideration under FFI. If appropriate and regardless of whether a criminal or regulatory investigation regarding the alleged conduct is pending, the District shall promptly take interim action (see below) calculated to address prohibited conduct or bullying prior to the completion of the District's investigation.
>
> If appropriate and regardless of whether a criminal or regulatory investigation regarding the alleged conduct is pending, the District shall promptly take interim action calculated to address prohibited conduct or bullying prior to the completion of the District's investigation. he investigation may be conducted by the District official or a designee, such as the principal, or by a third party designated by the District, such as an attorney. When appropriate, the principal shall be involved in or informed of the investigation. Absent extenuating circumstances, such as a request by a law enforcement or regulatory agency for the District to delay its investigation, the investigation should be completed within ten District business days from the date of the report; however, the investigator shall take additional time if necessary to complete a thorough investigation.
>
> The investigator shall prepare a written report of the investigation. The report shall include a determination of whether prohibited conduct or bullying occurred. The report shall be filed with the District official overseeing the investigation. If the results of an investigation indicate that prohibited conduct occurred, the District shall promptly respond by taking appropriate

        disciplinary action in accordance with the Student Code of Conduct and may take corrective action reasonably calculated to address the conduct. A student or parent who is dissatisfied with the outcome of the investigation may appeal through FNG(LOCAL), beginning at the appropriate level. A student or parent has the right to file a complaint with the United States Department of Education Office for Civil Rights."

12. The various actions that the School District can consider and provide include but are not limited to the following:

        "... nondisciplinary, nonpunitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the district's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the district's educational environment, or deter harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, increased security and monitoring of certain areas of the campus, and other similar measures. The district must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the district to provide the supportive measures."

13. Taken together, this amalgam of the law, regulations, professional guidelines and School Board Policies and Procedures create not just procedural but substantive "Parental Rights."

B.    ABOUT P.D.

14. P.D. was born in December of 2015. She is currently nine (9) years old. She lives with her parents in the FBISD catchment area. She attended the Second Grade Oakland Elementary School during the Fall 2023 Semester, the relevant time period that gave rise to the concerns addressed in this complaint. She has been diagnosed with Autism, an Emotional Disturbance, a Speech Impairment ("SI") and related behavioral concerns. She had significant deficits in social skills and emotional development as compared to her non-disabled peers. Sadly, because of her overt behaviors and disabling conditions P.D. soon became and object of

derision by her classmates

C.   P.D. BECAME AN OBJECT OF DERISION

15. For instance, during the Spring of 2023 Semester and through the early part of the Fall 2023 Semesters she would get hit, pushed, taunted and called names especially by swings and monkey bars at the playground. P.D. complained to her Classroom Teachers but to no avail. In fact, on one occasion she gave a note to Mrs. Prunty and Ms. Stika, that said "please stop them from making fun of me." She brought it home and told her parents the kids continued to make fun of her because her teachers would not stop them. She was constantly called things like weird, nasty or slow.

16. Her parents complained to a number of School District Staff by both email and telephone, especially to Christie Whitebek, Superintendent; Nancy Hummel, School Principal; Tonichia Jackson, Assistant Principal; Denna Hill, Director of Special Education and Lawana Stevenson, Teacher about the bullying P.D. was experiencing. They reported that it was so bad that P.D. did not want to go to gym and the cafeteria because was taunted there also. There was no response to bullying continued.

17. On one occasion two girls took P.D.'s notebook out of her back pack, kept it from her and taunted her when doing so. This occurred in the after-school program. Her parents complained to Mrs. Stevenson, which was met with the customary "I'm sorry" but with no action.

18. On one occasion the parents asked District Staff to provide P.D. a 1:1 Aide, so she would be protected, but the School District failed to do so. Left unrequited, the bullying and harassment increased. They also asked that staff there be trained on P.D.'s behaviors

including and especially those related to P.D.'s Autism and "so-called" weirdness, but they again failed to do so. Her parents asked that any child who bullied P.D. be punished, but that too did not happen. The bullying continued.

19. Alley Prunty was the classroom teacher during the period of the day in which most of P.D.'s behaviors occurred. In September 2023 she specifically went to both Ms. Hummel the Campus Principal, and Ms. Jackson the Vice Principal, regarding her concerns with her lack of knowledge and training on dealing with P.D. and her behaviors. She expressed concern with P.D.'s escalating issues which were beginning to include her being physically aggressive with both the other students as well as with her teachers. The only solution they offered Prunty was to send her to restraint training. There was no discussion of updating her Behavioral Intervention Plan or providing her additional evaluations, both of which would have been much more effective than doing nothing.

20. The children knew that their taunting would cause P.D. to not just react but overact with increased emotional reactions and worsening behavioral reactions and continued to intentionally taunt her or the reactions. But FBISD Staff punished P.D. instead.

D. DISTRICT STAFF UNNECESSARILY AND EXCESSIVELY RESTRAINED P.D.

21. During this entire period, and unknown to P.D.'s parents, she was being restrained by staff almost every day, and often multiple times a day. On or about October 6, 2023, P.D. came home from school crying. She had bruises all over her arms. She kept repeating, "they hurt me." Upon reason and belief, Plaintiffs allege that Stevenson, a special education teacher and Ladoya Clark, a special education aide, were present and caused the injuries.

22. In the interim of time since they unenrolled P.D. from FBISD Plaintiffs have learned exactly

how severe and pervasive the misuse and abuse of her restraint had become. Reports made under the requirement of law show the shocking frequency with which she was being restrained. The FBISD Restraint Reports show P.D. was restrained on August 17th (30 minutes), August 24th (15 minutes), September 26th (35 minutes), October 3rd (50 minutes), October 4th (20 minutes), October 6th (twice, once for 45 and once for 30 minutes), October 11th (10 minutes), October 12th (2 minutes) and October 13th (three times for sessions lasting 30, 150 and 1 minutes). (The FBISD calendar shows there was no school on Sunday, October 1st; Saturday, October 6th; Sunday October 7th; October 9th and 10th were "off days" for students, meaning for the month of October, out of the 8 days school was open and P.D. was in attendance, she was restrained on 6 of them. (On two of those dates she was restrained more than once.) Her parents unenrolled her after the 13th or the restraints surely would have continued.

23. When her father came home from work on October 6th P.D. met him in the driveway and showed him all her bruises. In his search Mr. Dhose observed that his daughter also had 'finger marks' on her upper arm along with numerous scratch marks. He and his wife asked P.D. what happened and she told them she was held down by Stevenson and Clark.

24. Mother and father shared their concerns via email and text message with both Christie Whitebek, Superintendent; Nancy Hummel, School Principal; Denna Hill, Director of Special Education and Lawana Stevenson, Teacher. Just as with their complaints of bullying and harassment these too fell on deaf ears except to admit that Staff had been restraining P.D. frequently. During these restraints School District personnel failed to use legally permissible interventions. In fact, some bordered on torture.

25. On or about the 13th, Mr. Dhose received a call from Ms. Stevenson about another 'incident.' Mr, Dhose could hear his daughter screaming in the background. P.D. was put on the phone and told her father that "they are hurting me." He immediately went to the school and observed severe bruising and scratches on her upper shoulder, with black and blue bruising on various parts of his daughter's arms. It was even worse than earlier occasions.

26. Chris Dohse again complained to Whitebek, Hummel and Stevenson, but received conflicting reports about what had occurred. The bruising and scratching was so deep and serious it left scabs. Later the parents learned from their daughter that she was injured this time Stevenson; Ashley Ashna, Administrator with Specialized Programs and Cedric Clark, Behavioral Specialist.

27. As noted above some of these restraints were more akin to torture.

28. During this entire period, and on multiple occasions P.D. was forced to sit in a square on the floor by her Classroom Teacher Alley Prunty. If she moved, was further punished and forced to remain there longer. Importantly, this was in the classroom where other children could see she was being ostracized by Staff.

29. On at least one occasion she was dragged from her classroom by Stevenson and Clark, and injured also in front of other children.

30. On at least one occasion P.D. had a pillow placed over her nose, face and entire head by Stevenson, Jackson and others, and could not breathe.

31. Also, and on at least one other occasion she was forced to lie on the her stomach on the floor with her hands behind her back by Ashlkey Ashna, Special Education Administrator and Cedric Clark Behavioral Specialist. Once again, staff only relented when P.D. complained

she could not breathe.

32. It is particularly noteworthy that on a number of occasions District Staff, including and especially Stevenson would trick P.D. and asked her to go get a broom and ask her to help clean a classroom area. Them when she went into the closet to get the broom, the door was closed behind her so she could not get out.

33. These attempts of to gain control of P.D. by force did not work, increasing the taunting by her peers. Not surprisingly she reacted, and it it worsened her behaviors which caused even more abuse.

34. Unable to see that these interventions were not abject failures, but made things worse, on one occasion School District Staff, including Stevenson, Jackson and other Administrative Staff apparently thought they could 'scare the child straight" and had her restrained and placed inside a locked Police Car with nobody inside with her. Sadly, it partially worked- she was so scared that she soiled herself.

35. Mother and father eventually filed a complaint with the School District's own Police Department but again nothing was done. They also filed a complaint with Child Protective Services alleging 'child abuse" but the CPS deferred back to the School District.

36. In early October FBISD held a "staffing" prior to the ARD Committee Meeting that was to be held on October 11, 2023. According to Ms. Prunty, it was at this staffing meeting that she was told she should be keeping data on P.D.'s behaviors. A "Behavior Documentation Log" was finally created and had it's initial entry made on October 2, 2023.

37. Nine days later, on October 11, 2023 an "ARD Committee Meeting" was held. In this meeting P.D.'s parents are informed of the decision by FBISD to change P.D.'s placement

        to a significantly more structured Behavior Support Services (BSS) Program held at the Mary Holley Elementary, a totally different campus. Campus administrators told the family that this placement was intended to help better regulating P.D.'s behaviors. The Committee had a duty to provide but failed to assure that P.D. received additional evaluations before recommending a more restrictive placement. The Committee also had a duty to provide, but failed to provide, P.D. all available relevant supports and services before making this recommendation.

38. Sadly, and now with the knowledge that the School District staff was not just only failing to protect their daughter from the bullying and harassment of other children, but were also injuring P.D. themselves, mother and father did what any reasonable parents would do- they removed their child from the Fort Bend Independent School District and provided P.D. what is termed 'Home School Services.' Now safely at home and in the community the use of a restraint has become unwarranted but the memories of the restraints, physical injuries and emotional trauma remains.

E.    P.D. HAS EXPERIENCED SIGNIFICANT TRAUMA DUE TO THE ABUSE .

39. P.D. continues to manifest trauma. She was physically injured during the multiple excessively injurious restraints with significant bruising. She trembles when the family drives by school or pull into pick up paperwork for another child. She will cry, start rocking and *stemming* and saying please don't send me back "they hurt me I thought they were going to kill me. I don't want to go inside mommy please let's go - lets go right now" Once they are a safe distance and time away. P.D. will finally stop shaking but ask "please don't let them hurt me mom please don't let them hurt me." Mother reports she continues to have

nightmares. On some occasions she will wakes up and blurt out 'I thought they were going to kill me I was scared.'

40. P.D.'s mother also reports that P.D. still refuses to sleep in her own bed and would go into her parents bedroom where she would noticeably rock and shake. When her parents are up watching TV for instance, P.D. will go to the couch due to her fear of being left alone. Her mother also reports that P.D. used to love going out with family and friends but has become more and more isolated, has regressed and started to use 'baby talks" and even soiling herself again, even though she was fully 'potty-trained' before the abuse. On occasion she will speak of being locked in the closet but when asked about what happened at school, she will cover her ears and shake. She will require years of specialized therapy,

41. The civil and constitutional rights of P.D. and her parents, were violated by the acts and omissions of the Fort Bend Independent School Board and School District.

### VII.  STATE ACTION

42. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the one above it.

43. Here the School District was at all times and in all matters acting under color of state and federal law when the Student P.D. was subjected to the acts, omissions, wrongs and injuries set forth herein.

### VII.  CLAIMS PURSUANT TO THE U.S. CONSTITUTION

A.  P.D. HAS CONSTITUTIONAL RIGHTS AT SCHOOL

44. Plaintiffs contend that the acts and omissions of the School Board violated the right of P.D.

   as to her physical privacy and life, liberty and the pursuit of happiness, as contemplated by the Fourteenth Amendment of the Constitution of the United States for which she seeks recovery against the School District pursuant to 42 U.S.C. §1983.

45. In addition, P.D. has a cognizable property right in her education pursuant to the Constitution of the United States and Texas. The School Board failed to ensure that P.D. was able to enjoy such rights, and as such, seeks recovery for damages pursuant to 42 U.S.C. §1983.

B. CLAIMS RELATED TO THE 4TH AMENDMENT TO THE US CONSTITUTION

46. Plaintiffs contend that the acts and omissions of School District Staff violated the rights of the Student pursuant to the Fourth Amendment of the Constitution of the United States for which they seek recovery pursuant to 42 U.S.C. §1983. Specifically, that the restraints were unnecessary and in addition and in the alternative, that the restraints were excessive. This claim is affixed against the FBISD.

C. CLAIMS RELATED TO THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

  1. Due Process Claims

47. Plaintiffs assert that the School District failed to sufficiently train staff to address the needs of children in general– and especially a student with a disability like P.D, thereby violating her rights pursuant to the Fourteenth Amendment of the Constitution of the United States, for which she seeks recovery pursuant to 42 U.S.C. §1983.

48. In addition, Plaintiffs contend that School District failed to sufficiently supervise staff regarding addressing the needs of children in general– and especially a student with a disability like P.D.

49. Such failures by the School District were a moving force in violating the rights of P.D., as

contemplated by Due Process Clause of the Fourteenth Amendment of the Constitution of the United States, for which she seeks recovery pursuant to 42 U.S.C. §1983.

    2.    Equal Protection Claim

50.    Such failures by the School District were a moving force in violating the rights of P.D, as a class of one, as contemplated by the *Equal Protection Clause* of the Fourteenth Amendment of the Constitution for which he seeks recovery pursuant to 42 U.S.C. §1983.

    3.    Fundamental parental Rights

51.    As noted above the acts and omissions by the School District Defendant violated both the fundamental procedural and substantive rights of each parent, as contemplated by the 14th Amendment to the United States Constitution, likewise protected by 42 U.S.C. §1983.

## VIII. <u>VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973</u>

52.    The School District receives federal funds and thus must follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"). The implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

A.    FAILURE TO KEEP SAFE CLAIM

53.    In addition and in alternative to the above, the Student asserts that the School District failed to provide her a safe and non-hostile educational environment, and as such she is a victim

of discrimination based upon disability pursuant to Section 504.

B.    FAILURE TO ACCOMMODATE CLAIM

54. The above noted facts also support a plausible "failure to accommodate claim" pursuant to the Rehabilitation Act and similar to the ADA claim noted below.

## IX. CLAIMS RELATED TO THE AMERICANS WITH DISABILITIES ACT

55. In addition, and in the alternative to the above, the facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

56. Specifically, and separate and apart from her Section 504 cause of action, the Student alleges that the School District failed and refused to reasonably accommodate and modify services needed by her based upon her disabilities in violation of Title II of the ADA. Likewise, and also in addition and in the alternative, the Student was a victim of discrimination based upon disability by the School District.

## X. RATIFICATION AND RESPONDEAT SUPERIOR

57. The Fort Bend Independent School Board ratified the acts, omissions and customs of School District personnel and staff.

58. Additionally, the School Board is responsible for the acts and omissions of School District Staff Members who injured P.D. pursuant to the theory of *Respondeat Superior*.

## XI. DAMAGES

59. As a direct and proximate result of the Defendant's conduct, P.D. has suffered injuries and damages, for which she is entitled to recover including but not limited to:

    a.    Loss of equal access to educational opportunities;

    b.    Nominal damages;

c. Physical pain in the past;

d. Medical expenses in the past;

e. Mental anguish in the past;

f. Mental anguish in the future;

g. Mental health costs in the past;

h. Mental health costs in the future;

i. Reimbursement of educational services in the past;

j. Reimbursement for educational services to be paid in the future; and

k. Reimbursement of past and future out-of-pocket expenses incurred by the family of P.D. but for the acts and omissions of the Defendant.

## XII. SPOLIATION

60. Plaintiffs hereby require and demand that the School District preserve and maintain all evidence pertaining to any claim or defense related to violations, causes of action, facts, and resulting damages set forth herein and/or made the basis of this petition and request for due process, including, but not limited to, statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence, potential evidence, or potentially discoverable documents.

61. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation interference rule—an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

**PRAYER**

Plaintiffs further prays for judgment against the School District in the manner and particulars noted above, and in an amount sufficient to fully compensate P.D. and her parents both in the representative and individual capacities, for the elements of injuries enumerated herein, pursuant to the United States Constitution, Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act and for such other and further relief as the Court may deem just and proper in law, equity, or both.

Respectfully submitted,

/s/ Martin J. Cirkiel
Martin J. Cirkiel, Esq.
Texas Bar No.: 00783829
Fed. ID No.: 21488
Cirkiel Law Group, P.C.
1005 West 41st Street Suite 201
Austin, Texas 78756
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

REPRESENTATIVES FOR PLAINTIFFS